## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) | Case No. 17-41215-CJP |
| BRADLEY DAVIDSON, | ) |  |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
|  | ) |  |
| MATTHEW WHITE, | ) |  |
|  | ) |  |
| Plaintiff, | ) | AP No. 17-04048-CJP |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| BRADLEY DAVIDSON, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

# BENCH RULING[1]

## I.     INTRODUCTION

Before me is the amended complaint [Dkt. No. 57] (the "Amended Complaint") of the

plaintiff, Matthew White ("White" or the "Plaintiff"), brought against the debtor-defendant,

Bradley Davidson ("Davidson" or the "Debtor").  White seeks a determination that any debt

owed to him by Davidson is nondischargeable under three subsections of 11 U.S.C. § 523(a) in

his Amended Complaint: Count I is for a debt obtained by alleged misrepresentations or fraud

under § 523(a)(2), Count II is for a debt for fraud or defalcation while acting as a fiduciary under

---

[1] This Bench Ruling supersedes the oral ruling delivered on the record and constitutes the final version of the decision of the Court, and the parties should cite to it as the record decision.  As a general matter, the Court issues oral rulings in conjunction with bench rulings to facilitate expeditious determinations of matters. This Bench Ruling obviates the need for the parties to obtain a transcript of the reading of the decision into the record. The format of this Bench Ruling is less formal than a written "Memorandum of Decision" or "Opinion" and is intended to explain the basis for my rulings resolving the Amended Complaint in this matter. It is not intended for publication.

§ 523(a)(4), and Count III is for a debt for willful and malicious injury under § 523(a)(6).[2]  I

granted a construed motion for judgment on partial findings as to Count II after the Plaintiff

rested. *See* Ord., Dkt. No. 259.

The following decision constitutes my findings of fact and conclusions of law in

accordance with Federal Rule of Bankruptcy Procedure 7052.  In making this decision, I have

carefully considered the testimony and credibility of the five witnesses who testified over four

days, the 63 documentary exhibits admitted by agreement or at trial, the arguments of counsel,

and the applicable legal standards.  For the reasons I will explain, I find that White has not met

his burden of proof as to either of the remaining counts, and I will enter judgment in favor of

Davidson.  I will also deny Davidson's request for sanctions.

## II.    JURISDICTION

I have jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334 and Rule

201 of the Local Rules of the United States District Court for the District of Massachusetts.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (I).  I have both subject

matter jurisdiction and constitutional authority to enter final orders on whether the debt claimed

by White is nondischargeable, which is acknowledged by the parties.  I also determined on the

record at a case management conference held on March 11, 2021, which oral ruling I incorporate

by reference, that I have jurisdiction and authority to enter a final judgment, both with respect to

the nondischargeability of Davidson's debt, but also, to the extent White prevails on any of his

counts, to determine the amount of the debt that would not be discharged.  *See* 3/11/2021 Oral

Ruling; *see also Chen v. Huang (In re Wen Jing Huang)*, 509 B.R. 742, 751 (Bankr. D. Mass.

2014) (holding that "in the context of the dischargeability proceeding, the bankruptcy court is not

---

[2] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C.
§§ 101, *et seq*., as amended (the "Bankruptcy Code" or "Code").

only tasked with determining whether the circumstances for nondischargeability enumerated in §

523(a) are established, but must also necessarily determine the scope of the debtor's liability on

[the] claim and the creditor's right to payment. and that "[t]hese determinations, . . . place the

existence and scope of the debtor's liability and the creditor's right to payment squarely within

the bankruptcy court's core jurisdiction." (internal quotations and citations omitted)); *Baker v.

Friedman (In re Friedman), 300 B.R. 149, 151 (Bankr. D. Mass. 2003). But see Cambio v.

Mattera (In re Cambio)*, 353 B.R. 30, 34–35 (B.A.P. 1st Cir. 2004) ("conclud[ing] that the

bankruptcy court did not have jurisdiction to enter a money judgment on the nondischargeable

debt under the circumstances of [the] case" because, among other things, "facts serving as the

foundation for both causes of action (the dischargeability of the debt and damages due to the

breach of contract) [were] not inextricably intertwined, allowing for their severance and

resolution by courts with unquestionable subject matter jurisdiction").

## III.  LEGAL STANDARDS

As the party seeking to except a debt from discharge, White bears the burden of proving

each element of the subsections of § 523 at issue by a preponderance of the evidence. *See

Grogan v. Garner*, 498 U.S. 279, 291 (1991). "The Bankruptcy Code aims to strike a balance

between providing debtors with a fresh start by discharging debts . . . , and avoiding abuse of the

system." *Sauer Inc. v. Lawson (In re Lawson)*, 791 F.3d 214, 218 (1st Cir. 2015). "To this end,

the Code exempts from discharge certain types of debt in an attempt to 'limit [ ] th[e]

opportunity [for discharge] to the honest but unfortunate debtor.'" *Id*. (quoting *McCrory v.

Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001) (internal quotations and citation omitted)).

"Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's fresh

start policy, and, for that reason, the claimant must show that his claim comes squarely within an

exception enumerated in Bankruptcy Code § 523(a)."  *Palmacci v. Umpierrez*, 121 F.3d 781, 786

(1st Cir. 1997) (quotations omitted).

### A. <u>Count I: § 523(a)(2)</u>

Count I of the Amended Complaint does not specify whether relief is sought under §

523(a)(2)(A) or (B), but White has acknowledged on the record that his claim is under subsection

(a)(2)(A) and not (B).  Section 523(a)(2)(A) excepts from discharge "any debt for money,

property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by

false pretenses, a false representation, or actual fraud, other than a statement respecting the

debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A).  "In order to establish a

debt is nondischargeable under § 523(a)(2)(A) due to a false representation, the plaintiff must

show that: (1) the debtor made a knowingly false representation or one made in reckless

disregard of the truth; (2) the debtor intended to deceive; (3) the debtor intended to induce the

creditor to rely upon the false statement; (4) the creditor actually relied upon the

misrepresentation; (5) the creditor's reliance was justifiable; and (6) the reliance upon the false

statement caused damage." *Privitera v. Curran (In re Curran)*, 554 B.R. 272, 285 (B.A.P. 1st

Cir. 2016), *aff'd sub nom. In re Curran*, 855 F.3d 19 (1st Cir. 2017) (quotations and citations

omitted).  Courts in this district have generally described the elements as follows:

> The first element, making a knowingly false representation, refers to the
> conduct of the debtor and can include a debtor's promise to act, "[i]f, at the
> time he made his promise, the debtor did not intend to perform[.]" *Palmacci*,
> 121 F.3d at 786–87. The second element, intent to deceive, refers to the
> Debtor's mental state and specifically requires a mental state embracing an
> intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425
> U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47 L.Ed.2d 668 (1976); *Palmacci*, 121
> F.3d at 786–87. Intent to deceive may be demonstrated by showing that "a
> false representation has been made ... recklessly, careless of whether it is true
> or false," or, in other words, with reckless disregard for the truth. *Palmacci*,
> 121 F.3d at 787 (citations omitted) . . . .

> The final four elements embody the requirement that the creditor's claim must
> arise directly from the debtor's fraud. [*Faria v. Silva (In re Silva)*, No. 12-
> 17413-WCH, 2014 WL 217889 *1, *5 (Bankr. D. Mass. Jan. 21, 2014)] (citing
> *McCrory*, 260 F.3d at 32). As to the creditor's reliance, the Supreme Court of
> the United States has held that § 523(a)(2)(A) requires only justifiable
> reliance—a lower standard than reasonableness. *Field v. Mans*, 516 U.S. 59,
> 70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Reliance is justifiable if the falsity
> of the representation would not have been readily apparent to the person to
> whom it was made. *Id*. at 70–72, 116 S.Ct. 437. For purposes of determining
> whether reliance was justified, "the circumstances of the reliance claim must
> be taken into account," and "the individual is not obliged to investigate
> statements made to him (although he cannot shut his eyes to an obvious
> falsehood)." *Lentz v. Spadoni (In re Spadoni)*, 316 F.3d 56, 59 (1st Cir. 2003).

*Zutrau v. Zutrau (In re Zutrau)*, 546 B.R. 239, 251 (Bankr. D. Mass. 2016), *aff'd*, 563 B.R. 431

(B.A.P. 1st Cir. 2017).[3]

### B. <u>Count III: § 523(a)(6)</u>

Count III requests a determination that Davidson's debt is nondischargeable pursuant to §

523(a)(6).  Section 523(a)(6) prevents a debtor from discharging debts "for willful and malicious

injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).

A determination a debt is nondischargeable pursuant to § 523(a)(6) requires a showing of three

elements: "that 1) the creditor suffered injury; 2) the debtor intended to cause the injury or that

---

[3]  White's § 523(a)(2) claim appears to be based on the false representations category but, even if a "false
pretenses" claim was intended by White based on his allegations of misrepresentations made by Davidson
purportedly intended to induce White to provide funds to Davidson, the applicable standard "would be
largely the same."  *Casper v. O'Sullivan (In re O'Sullivan)*, 630 B.R. 679, 688 (B.A.P. 1st Cir. 2021).  In
*In re O'Sullivan*, the Bankruptcy Appellate Panel stated that:

> While a claim for false pretenses is a separate and distinct category under §
> 523(a)(2)(A), the requirements are largely the same, except that requirement of a false
> representation is replaced by a requirement of a false pretense, which is an implied
> misrepresentation or a false impression created by conduct of the debtor. False
> pretenses arise when the circumstances imply a particular set of facts, and one party
> knows the facts to be otherwise but does not correct the counter-party's false
> impression.

*Id.* (quotations and citations omitted).

there was substantial certainty that the injury would occur; and (3) the debtor had no justification

or excuse for the action resulting in injury." *Bauer v. Colokathis (In re Colakathis),* 417 B.R.

150, 158–59 (Bankr. D. Mass. 2009) (citing *Kawaauhau v. Geiger,* 523 U.S. 57 (1998) and

*Printy v. Dean Witter Reynolds, Inc.,* 110 F.3d 853 (1st. Cir. 1997)).  As summarized by the

United States Court of Appeals for the First Circuit:

> An injury is malicious "if it was wrongful and without just cause or excuse,
> even in the absence of personal hatred, spite or ill-will." *Printy v. Dean Witter
> Reynolds, Inc.*, 110 F.3d [at 859] (quoting 4 Collier on Bankruptcy ¶ 523.12
> (15th ed.1996)). The injury must have been committed in "conscious disregard
> of one's duties." *Id*. Willfulness requires "a showing of intent to injure or at
> least of intent to do an act which the debtor is substantially certain will lead to
> the injury in question." *In re Neronha*, 344 B.R. 229, 231 (Bankr. D. Mass.
> 2006).

*Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur)*, 737 F.3d 814, 818–19 (1st Cir.

2013).  The Supreme Court held that § 523(a)(6) requires a debtor to intend the injury, not just

the act that leads to the injury.  *Kawaauhau v. Geiger*, 523 U.S. at 61–62.  Therefore, recklessly

or negligently inflicted injuries are not excepted from discharge under § 523(a)(6).  *Id*. at 64.

## IV.    FINDINGS OF FACT[4]

White and Davidson's business relationship began in 2013.  White is a singer, songwriter,

and recording artist, who had attained some recognition for his songs "Love" and "Best Days."

His music had been used in at least one commercial and multiple television programs prior to the

commencement of the parties' relationship.  Davidson has been an active member of the music

industry since 1998, and had extensive experience at major labels promoting artists and their

music by the time the parties contemplated working together.  He had achieved success in what

he characterized as "breaking" several new artists and songs.

---

[4] To the extent any item labeled as a finding of fact is actually a conclusion of law (or the opposite), it is
adopted as such.

6

Think Say Music, LLC ("ThinkSay") was a small, independent record company that had signed and released music from several artists, and Davidson was one of its three principals and managers, the other two being Barry Byrd and, later, Daniel Pearson.  Davidson and his original partner, Byrd, hoped to capitalize on their experience and reputations to create and grow ThinkSay, in order to later sell the company to a larger label.  Byrd had left the company by the time White became involved with ThinkSay.  Pearson had been Davidson's assistant at another company and subsequently joined ThinkSay.

In 2013, White, Davidson, and Pearson began discussing having ThinkSay re-release White's single "Love."  There was conflicting testimony of who reached out first, but the evidence best supports that White approached Davidson through social media to discuss a relationship where ThinkSay would promote radio play for White's song "Love."  White testified that, because he was the singer and songwriter who owned the rights to the song, radio play would provide royalties and could also lead to concert and merchandising revenue.  When originally released, "Love" apparently did not receive much airplay.  I credit the testimony of Davidson and Pearson that, while White had previously achieved success and had toured with recognized artists and obtained recognition of his songs through exposure in television shows and appearances, by industry standards he would still be considered a developing artist in 2013 and 2014.  White hoped to take his exposure to the next level.  ThinkSay had been recognized by Apple Music as 2012 best independent label and had succeeded in "breaking" an artist similar to White.

Because his songs had not achieved widespread commercial success, White apparently did not receive offers from record labels re-release and promote "Love."  Instead, he pursued a "self-funded" deal.  Both he and Davidson described how using ThinkSay as a record label to

7

promote "Love" would distinguish White's song from new artists who might hire a promotions company.  Radio outlets and others would not know that White's deal was self-funded, and he might gain greater exposure because of the reputations of Davidson and Pearson and their previous successes and contacts.

White and Davidson discussed a promotions strategy for "Love."  Initially, White obtained the support of an investor and proposed a funding deal where that investor would fund the promotion of three of White's songs by ThinkSay for $500,000 and invest an additional $500,000 in ThinkSay.  This deal did not come to fruition.  White continued to work with ThinkSay towards an arrangement.  At the time of these continuing discussions, in April 2014, the evidence shows that ThinkSay had only approximately $16,000 in its bank account. (Trial Ex. 3).  It had required a $50,000 loan for working capital from Davidson in January of 2014, and had been actively seeking capital since one of its partners left.  (Trial Exs. 41, 43, 46, and testimony).  In fact, White considered providing a $50,000 bridge loan to Think Say, but testified that his business manager warned him against making such a loan and that he ultimately did not make the loan.  He was aware that ThinkSay had no money and testified that he "related to that," having abandoned a legal education to pursue a music career.

White then obtained the support of Christopher Burch, a wealthy investor and former husband of White's cousin, and Burch and his entity, Burch Creative Capital ("BCC"), became involved in the discussions.  The initial point person for BCC was Kevin Maas.  The testimony of White, Davidson, Pearson, and Maas was consistent that these discussions were protracted and involved various structures and possible investment in ThinkSay by Burch and/or BCC.

By March of 2014, a promotions deal was being negotiated that would require White to pay ThinkSay $500,000 to self-fund the promotion of "Love."  This amount would be advanced

by Burch on behalf of White.  White signed a licensing agreement with Burch on or about April,

4, 2014.  Before any agreement between White and ThinkSay had been reduced to writing,

Burch wired $250,000 to ThinkSay on April 4, 2014.  (Trial Ex. 3).  White testified that he did

not authorize that wire and was "shocked" that it had been made.  He did not demand the return

of those funds at that time.  In a March 13, 2014, email from Davidson to White and Pearson,

Davidson characterized the first $250,000 payment as a "deposit" and stated that "arrangements"

would be made to return the $250,000 if "a deal was unable to be reached."  (Trial Ex. 58).

White testified that Davidson and ThinkSay had provided a budget in March on which he

relied.  That budget reflected a total budget of $500,000. (Trial Ex. 38).  Davidson testified that

he could not identify that budget and that there were numerous budgets considered in connection

with various possible deals with White both internally and with White or Burch.  Davidson

appeared evasive on this point, but White did not offer emails transmitting the budget at Trial

Exhibit 38 into evidence.  An email in a thread of emails from late February, 2014, admitted as

part of Trial Exhibit 42, appears to reflect that White and Davidson were discussing funding for

the project that would provide $330,000 for project expenditures and $170,000 to "pay

ourselves"—presumably salaries or profits.  Davidson denied the authenticity of certain of the

emails in that exhibit, and the emails appear out of chronological order and with different

formatting.  A series of emails on or about March 13, 2014 between Davidson and White

summarize the deal terms and do not appear to constrain ThinkSay on the use of the $250,000 to

be advanced by Burch.  (Trial Ex. 58).  White acknowledged by email that he did not care if

money is "spent for other stuff, [he] just want[ed] to keep it uniform for [B]urch" and indicated

that Burch just "wanted a rough estimate for what the 250k is spent on."  *Id*.  White asked

Davidson to put "something together like what u guys need for salaries and what We need for

Kerry etc" to give to Burch. *Id*. Davidson characterized the deal as a "self funded deal with 330 going to the project and 170 towards salaries." *Id*. He noted that the "salaries really aren't something to write home about" apparently given the amount of time needed to "break" a single and that he viewed the $500,000 as "enough to get us going." *Id*. Davidson also wrote that "[i]n terms of letting Chris know how the first 250 would be used, versus the second, it is not really like that. It's securing the full amount to be able to do the travel, set up, legal, parts, etc. to go to market." *Id*.

Davidson and Pearson testified extensively about what a promotional radio campaign and re-release of a song would entail and what they contemplated for the "Love" single re-release. This included a re-mix of the song to update it for what was popular in radio at the time and to distinguish it from the prior release, new art for a promotional CD to be sent to radio program directors, a video treatment, station outreach and visits, pre-release plays in certain markets, and then re-release of the song—which they described as the "impact date." White testified to similar steps required to re-release "Love" and promote it for radio play.

Very little tangible activity for the re-release project appears to have occurred between April 4, 2014 and the end of June of 2014. (Trial Exs. 2 and 56). No written agreement had been finalized between ThinkSay and White, and they began to have conflicts, with White complaining that little work was being done on his project. Eventually, White began to indicate that he may wish to terminate the arrangement if there was not progress. White took steps to re-mix "Love" without the approval of ThinkSay, including hiring a producer. Davidson testified that, at the time, there was confusion as to whether White owned the rights to the original release of "Love." Although White testified there was no confusion, he also testified that at some point he had purchased certain rights back from another label. It appears from the record that, during

this time, there was continued effort on the part of ThinkSay to secure additional funding for

White from Burch and to finalize a contract with White.  Given the extensive back and forth on

these subjects, they seem to have been a significant focus for both White and Davidson.

The record is clear that days after Burch wired the initial $250,000 on April 4, 2014,

ThinkSay repaid Davidson $82,293.45 for loans he had made to ThinkSay and that, from

April 4, 2014 until the next transfer by Burch on July 21, 2014, approximately $95,600 was paid

to Davidson and Pearson in salary and expense reimbursements.[5]  (Trial Ex. 41).  ThinkSay's

bank records and cash flow report for this period were admitted in evidence, and Davidson did

not identify substantial expenditures in connection with White's project, but testified that

ThinkSay was allocating internal resources for planning and dealing with White.  I also note that,

when asked specific questions about ThinkSay's cash flow and expenditures, neither Davidson

nor Pearson would admit to handling any financial decisions or accounting for ThinkSay.

Davidson testified that he was not responsible for the finances but that he relied on others,

including accounting professionals.  Pearson testified that Davidson handled finances of

ThinkSay given his role as president.

On June 21, 2014, Davidson sent Burch a "breakdown" Burch requested.  (Trial Ex. 40).

Davidson referred to "the budget presented here" as "raw numbers" and attached a document

titled "TS-MattWhite Breakdown.xlsx."  *Id*.  There was testimony presented that the attachment

was a budget captioned "Matt White 'Love' (Single) Budget" which reflected categories of

project-related expenses, including salaries in the total amount of $85,000.  (Trial Exs. 39 and

40).  The total expenditures amounted to $510,000.  (Trial Ex. 39). White was not copied on the

original email, but was copied on a June 22, 2014 email that may have forwarded the budget.

---

[5] There were also additional payments made to other ThinkSay employees as well. (Trial Ex. 41).

(Trial Ex. 40).  White testified that he saw and relied on the budget.  On July 21, 2014, Burch

wired another $150,000 to ThinkSay.  (Trial Ex. 4).  Burch approved funding the full

$500,000—again without a written agreement between White and ThinkSay.  During the period

from the July 21, 2014 disbursement to the final disbursement on December 2, 2014,

approximately $119,450 was paid to Davidson and Pearson for salaries and expense

reimbursements. (Trial Ex. 41).  For the remainder of 2014 after the December 2, 2014

disbursement from Burch, an additional $36,115 was paid to Davidson and Pearson.  White

testified that, both before the written agreement was executed and after, he believed that

ThinkSay was scamming him and Burch.

    The relationship between White and ThinkSay continued to deteriorate.  White and

Davidson had direct communications, but, also, White would complain to Burch and Maas about

ThinkSay, and ThinkSay would complain about White to Burch and Maas.  The evidentiary

record shows that over time Maas, a finance employee of BCC, developed a relationship with

Davidson and Pearson and accepted their version of events and shared in their assessment of

White as difficult.  This may have influenced Burch.  Burch did not testify at trial, so I am unable

to evaluate what may have influenced him, however, there was evidence in the record that Burch

became agitated with White and told him to stick to the "creative side" and let ThinkSay do their

job.  Maas stated the same to White and told him that he would be watching the expenditures of

ThinkSay to protect Burch's investment "on a daily basis."  While Maas later testified that he did

not mean "daily basis" literally, he clearly did not keep even a close eye on the expenditures.  In

fact, there was little accountability for the $400,000 that was advanced on White's behalf.

    Davidson and Pearson credibly and consistently testified regarding the work that was

performed by ThinkSay between June 21, 2014 and April of 2015, which included work that was

consistent with what each described as the plan to prepare for a re-release of a song. Their

testimony was corroborated by Trial Exhibits 27–38, which are examples of ThinkSay's work

product related to White, Trial Exhibits 49–55, which are emails forwarding information

regarding that work product, and Trial Exhibit 56, which is a timeline of events Davidson and

Pearson testified was maintained contemporaneously by Kerry Lee, an employee of ThinkSay, to

record events in the relationship of ThinkSay with its artist clients. I note that some of the

information in Trial Exhibit 56 appears self-serving and seems to have a tone that indicates it

may have been created or modified at a later date, possibly in anticipation of litigation.

Davidson, Pearson, and Maas testified that work was being performed consistent with

ThinkSay's pre-release plan. They each testified that certain delays in finalizing the contract

were attributable to White demanding a "slush fund" of as much as $100,000 for him to spend

from the amounts to be funded by Burch, which White denied ever requesting.

White continued to assert that ThinkSay was not spending the funds on his project, and

Burch began to ask questions. Maas was ineffective in obtaining an accounting from Davidson

of amounts spent on the "Love" project or was easily placated by Davidson's responses to his

inquiries. When ThinkSay's accountants produced documents entitled "Matt White Budget

Spent" that were provided to Burch in June of 2015, the documents reflected that approximately

$160,000 had been spent on the "Love" project including certain allocated salaries. These

amounts changed from an earlier accounting that allocated additional expenses to the project.

(Trial Ex. 45). White contends that the "timeline" prepared by ThinkSay and evidence of

activity during and after this period was fabricated after the fact and that ThinkSay did little on

the project while exhausting the funds provided by Burch, mostly to pay the salaries of Davidson

and Pearson and other overhead expenses. White denies the allegations that he demanded a

"slush fund" and testified that he had legal and production expenses for which he wanted to be reimbursed.

In November or December of 2014, White and ThinkSay finally executed an Exclusive Recording Agreement dated as of October 28, 2014 (the "Agreement").  (Trial Ex. 18).  The Agreement was executed long after the relationship began and provided for payments totaling $500,000 from White (or a third party on his behalf), of which $400,000 was paid before the Agreement was executed.  Burch disbursed the final $100,000 on or about December 2, 2014.  (Trial Ex. 7).  On or about November 25, 2014, White executed and delivered a promissory note to Burch for $500,000.  (Trial Ex. 15).

The Agreement is strikingly one-sided in favor of ThinkSay, with only minor exceptions related to reimbursement of expenses to White.  For example, in ¶ 6(a), the Agreement imposes no specific budgets, commitments to expenditures, or restrictions on the use of the $500,000 paid to ThinkSay by Burch on behalf of White.  The Agreement contemplates that a recording budget would be designated by ThinkSay after consultation with White, but this did not happen in any meaningful formal or  informal manner.  The Agreement specifically provides in ¶ 8(e) that the $500,000 (defined as the "Artist's Contribution") will be used by ThinkSay as it sees fit and that ThinkSay "shall not be required to expend the entire balance of Artist's contribution" for White's benefit.  The Agreement further states that "[a]ny portion of Artist's Contribution not used by [ThinkSay] as described in this Agreement shall be retained by [ThinkSay] for its own account." (Trial Ex. 18, ¶ 8(e)).  Davidson testified that this was the deal from the start because, as a developing artist, White had to fund the promotion and re-release himself and that White determined to enlist ThinkSay in hopes that the association would re-launch his career for greater commercial success.  Davidson testified that there were no specific commitments made and that

14

many budgets were discussed, but, as ultimately reflected in the Agreement, those budgets would not control.

The evidence shows that White continued to press ThinkSay after the Agreement was executed, asserting that insufficient effort and expenditures were going toward his project. White began communicating with radio station program directors directly and others regarding ThinkSay. The radio station direct contact appeared to be partly an attempt to corroborate whether ThinkSay had promoted him and partly to rehabilitate his reputation, which he believed ThinkSay tarnished. ThinkSay had made a determination not to take White on a tour of radio stations, but rather to promote "Love" directly without artist visits. Davidson testified that this was because of White's arrogant behavior at one or more early visits, and, while Pearson was less pejorative in his testimony, he similarly echoed that White was not as humble and relatable as they would have liked, such that he and Davidson decided not to take him on further visits. Pearson testified that he visited and contacted radio stations to promote the re-release without White. The number of visits to radio stations by Pearson, and the amount of promotional effort by ThinkSay is subject to conflicting evidence, but I find that ThinkSay made some effort in the period of June of 2014 through April 29, 2015, when Burch informed Davidson that the White project was over. It was apparent that by the time the project was terminated, the relationship between ThinkSay and White had oriented toward Burch and making things "best" for him. (Trial Ex. 26). Davidson and Pearson also testified that ThinkSay intended to perform further necessary services after the re-launch or "impact date," but those services were not performed because Burch terminated the arrangement on behalf of White. Both testified that they believed in the "Love" single and White's talent.

The testimony regarding White's demand for a "slush fund" was conflicting.  Only Davidson testified to the $100,000 number and, in the end, the Agreement provided for approximately $14,500 for expense reimbursements of White, more in line with amounts referenced by Maas and Pearson.  It appears that, while White may have requested control over or reimbursement from a certain amount of funds, there is no credible evidence that White was attempting to enrich or benefit himself in any way that would not be visible to Maas or Burch.

In the end, Burch agreed that he would not pursue collection of his promissory note from White and would address any issues with ThinkSay regarding funding of the White deal.  White sued Davidson, Pearson, and ThinkSay in New York state court on July 15, 2015, and ThinkSay ceased communications with Burch.  (Trial Ex. 17).  White testified that the ThinkSay deal caused him issues within his family and essentially depleted $500,000 that Burch would have provided to another group to promote him and  "Love."  While he has been released from his obligation to Burch, White contends that he has suffered lost opportunity damages and direct damages.

I will not address the somewhat ugly allegations that have been made regarding acts between the parties after the business relationship ended.  My focus has been on evidence relevant to the claims that White was fraudulently induced by Davidson to have Burch pay ThinkSay and to enter into the Agreement.

## V.     ANALYSIS

### A.  Nondischargeability Provisions

Both § 523(a)(2)(A) and (a)(6) require that a plaintiff show by a preponderance of the evidence that a debtor had the intent to deceive the plaintiff or to cause injury to the plaintiff.  In this case, that intent must be shown at the time Davidson allegedly induced White to authorize

payment by Burch on his behalf and, ultimately, to sign the Agreement. With respect to the fraudulent misrepresentation claims embodied in Count I under § 523(a)(2)(A), White must also demonstrate that he actually relied on Davidson's statements and that the reliance was justifiable.

Based on the record it is clear to me that Davidson took advantage of the three-way deal structure, where work was being contemplated before a final agreement was in place between White and ThinkSay and without appropriate controls, to obtain working capital for ThinkSay and to allow ThinkSay to repay Davidson's loan. The unusual dynamic of the Burch funding and the advances made prior to signing the Agreement allowed Davidson to gain leverage and influence White by negotiating with Burch directly and raising the difficulties ThinkSay was having with White. White may have done things outside the ThinkSay plan and may have inappropriately communicated with third parties, but it is also clear that Davidson was put off by White and directed his efforts to cultivate a relationship with and influence Burch, who may have been a potential investor or resource. It is also clear that the clash of egos between White and Davidson contributed to the deterioration of the relationship. Davidson believed that he and Pearson had success with emerging artists and their process should not be questioned, and there was some evidence that White recognized their track record and the approach to promotion suggested by ThinkSay and appeared to be willing to take steps to placate Burch to work with ThinkSay. From Davidson's testimony, I inferred that he believed that a fiscally healthy ThinkSay was necessary for White to succeed and that the pathway to success for White would come by association with Davidson and Pearson and their prior successes. For White, he believed that he brought more to the table than he was being given credit for and wanted input and control. Unfortunately for White, Burch was willing to fund without a written contract being finalized between White and ThinkSay and Maas was ineffective in asserting any reporting or

controls, which appears to be because of what can best be described as his apparent desire to befriend and align himself with  Davidson and Pearson and their connections in the entertainment industry and apparent disdain for White.  Ultimately, it appears that Burch was pressuring White because he believed White was acting out and disrupting the process and that White signed the Agreement because $400,000 had been advanced by Burch.

While Davidson may have taken advantage of the situation and the loose controls placed on advance funding, that does not mean that he acted with the requisite intent to defraud, convert, or cause malicious injury, or that White justifiably relied on any representations.  I have analyzed Davidson's intent and White's reliance at the time the Agreement was executed and each of the times Burch wired funds to ThinkSay on behalf of White, as either advances or in accordance with the executed Agreement: April of 2014, when Burch made the first advance or deposit, July of 2014, when Burch made the second advance, and December of 2014, when Burch made the final payment in accordance with the Agreement.

Examining the facts and circumstances of the first advance of $250,000 in April of 2014, I find that—while budgets were provided and there was an operating assumption fostered by Davidson that $330,000 would be spent on project expenses and $170,000 on salaries—no specific representations were made as to the use of the $250,000 deposit.  No evidence supports that Davidson agreed to hold the funds to be used in any specific way or represented that they would not be used for working capital.  White has not met his burden to demonstrate that Davidson intended for him to rely on any statement that $330,000 would be used from the funds advanced for White's project exclusively or how any purported breakdown governed the initial $250,000.

It is also clear from White's own testimony that he did not authorize the initial wire of $250,000 and was shocked it had been made.  He could not have relied on a representation given that circumstance, and there is no evidence that Davidson made any representation to Burch and Maas beyond the budget and operating assumptions discussed in emails.  Neither White nor Burch requested a refund of the $250,000, and ThinkSay had offered to make arrangements for its return if an agreement was not executed.  This may have been a hollow offer given ThinkSay's cash position at that time, but it is some evidence reflecting Davidson's intent. Additionally, White was aware that ThinkSay needed working capital and intended to use some funds to pay overhead and salaries.  He specifically stated in an email that he did not care that funds would be used to pay "other stuff."  The evidence is simply insufficient for me to conclude that Davidson made a false representation with the requisite intent to support a nondischargeability claim under either § 523(a)(2)(A) or (a)(6) as to the initial $250,000 advance, or that White justifiably relied on any representation regarding use of those funds. There is also no evidence that, as to the § 523(a)(6) claim, Davidson ever intended to cause injury to White, particularly where White had acknowledged that money would be spent on overhead and there was no formal agreement in place.

As to the $150,000 advanced in July of 2014, the evidence again shows that Davidson fostered an operating assumption that a majority of the $500,000 would be spent on project expenses and $85,000 on salaries and provided a "budget" consistent with that to Burch (Trial Ex. 39) but again no specific representations were made as to the use of or any restrictions on the additional $150,000 paid by Burch on White's behalf.  The "budget" lacked any detail and it is not clear whether salaries were allocated within other line items.  Further, by this time, White felt that he was being "scammed" and had asserted that to Burch.  It is unclear whether White saw

19

the budget before Burch funded the additional $150,000, but he was copied on emails after the amount was funded and Burch confirmed his funding commitment.  Again, Burch did not testify at trial, and Maas did not testify that he felt deceived in any way or that he or Burch relied on misrepresentations in authorizing the second advance.  There is no evidence that Davidson represented that the funds advanced by Burch would be held in trust or used exclusively to fund a specific budget.  Davidson walked a fine line between salesmanship and commitment, but White has not met his burden to demonstrate that Davidson made a false representation with the requisite intent to support a nondischargeability claim as to the second advance or that White justifiably relied on any representation regarding use of those funds.

Just as before, as it relates to the § 523(a)(6) count, although their relationship had begun to deteriorate and White was feeling "scammed" by ThinkSay, there is no indication that Davidson ever intended to cause the injuries that White described in his testimony, including familial discord given Burch's investment in him and the loss of investment funds and what he viewed as his lost opportunity to further his music career with a different record company. Davidson and Pearson both testified that they loved White's music (and Davidson testified that he continued to feel that way to this day), they believed he could be successful, they would have been happy to learn White had opportunities to perform before live audiences, and they would have completed the project and re-released "Love" had the deal not been terminated.  I credit the testimony of Davidson and Pearson that they intended that ThinkSay would continue to promote the re-release of "Love" until Burch terminated the project on behalf of White.

The final December, 2014 payment of $100,000 and the circumstances surrounding signing the Agreement present a slightly different analysis of the facts established by the record.

There was no credible testimony that Davidson made false representations to White or anyone else at the time the Agreement was signed. At that point, $400,000 had been advanced toward the $500,000 payment due from White. The contract had been reviewed by White's counsel and Burch's CFO. The Agreement was one-sided and had provisions for budgeting and consultation for pre-release tasks that would have already been completed. More importantly, the Agreement did not require any amount of the $500,000 to be expended on specific items, contain any representations as to how the funds had been spent, or place any restrictions on the use of funds. White testified that by the time he signed the Agreement, he firmly believed that Davidson had "scammed" him and that ThinkSay had not done what it said it had done; yet he signed the Agreement. He had no explanation at trial other than he had a gullible personality and was placed in a position where he was being pressured by Burch, who had already advanced $400,000.

The Agreement provides that the sale of records is speculative and that ThinkSay could exercise its judgment as to how "Love" would be sold, distributed, and exploited. (Trial Ex. 18, ¶ 23(b)). The Agreement also contained an integration clause providing that the Agreement set forth the entire agreement between White and ThinkSay and superseded all prior proposals, agreements, negotiations, representations, writings, and all other communications, whether written or oral, between the parties. (Trial Ex. 18, ¶ 23(a)). There was no evidence presented, or even an allegation made, that Davidson made any false representation regarding the effect of that provision. As mentioned earlier, the Agreement specifically provided that ThinkSay had sole discretion to pay for development, recording, marketing, and promotion expenses; it was not required to spend the entire balance of the $500,000 and could keep any amounts that were not spent for its own account. (Trial Ex. 18, ¶ 8(e)). Davidson contends that this is the record deal

21

that he contemplated from the beginning and that he and ThinkSay would have completed the

"Love" project had ThinkSay's services not been terminated.  While evidence shows that

ThinkSay only had an ending cash balance of approximately $40,000 at year end 2014, ThinkSay

continued to perform services until April of 2015.  White claims that he terminated ThinkSay in

March of 2015, but the evidence supports that Burch conveyed to Davidson that the project was

terminated at the end of April 2015.

In the end, while Davidson took advantage of a situation where ThinkSay was not held

accountable through adequate covenants and controls, White did not meet his burden to

demonstrate that Davidson intended to injure him, convert his funds, fraudulently induce him, or

defraud him.  He also did not meet his burden to demonstrate that he actually relied or justifiably

relied on any representations.  The integration clause and other clauses of the Agreement

undercut White's claims of reliance, certainly as to the final advance, but also as to the other

advances.

Because White has not met his burden on these elements on either Counts I and III, I

need not reach the issues surrounding White's proof of damages.

Even if one accepts that White was a difficult client, Davidson's actions, while not

proven to be fraudulent, in conscious disregard of his duties, or without justification, took

advantage of White and his sponsor and marginalized White.  Unfortunately, Maas was not

effective in protecting Burch's interests or, by extension, White's interests and contributed to the

deteriorating relationship between White, Burch, and ThinkSay.  Further, White ultimately

signed the Agreement, which was not favorable to his interests.  While Burch has released White

and will not seek to collect the $500,000 note, White has lost the opportunity to use the $500,000

committed by Burch to promote the re-release of his song that could have benefited his career

22

using other professionals.  Some of that may be as the result of White's own actions, but I also

recognize that Davidson and Maas acted unprofessionally at times, and that the re-release of

White's single was not successful.  Burch's willingness to advance $400,000 without any written

agreement or controls placed on the use of those funds created an environment where ThinkSay

could marginalize White and do as it wished to promote "Love."  Even so, Burch advanced the

final $100,000 on behalf of White with full knowledge of the terms of the Agreement.  It may be,

as Davidson has implicitly suggested, that an artist who is not established pays their money and

takes their chances on a self-funded record deal and that, had ThinkSay been allowed to re-

release "Love," it would have been properly promoted and supported on and after the "impact

date."  This appears to be the earnestly held view of Davidson that allowed him to discuss and

provide budgets and breakdowns without committing to follow them, and to use funds advanced

by Burch to repay loans to himself and pay ThinkSay's overhead.  Davidson's actions raise

questions about the way he conducted himself, but White did not meet his burden to prove that

Davidson made misrepresentations with the intent to injure White or that White justifiably relied

on any representations.[6]

**B.  <u>Sanctions</u>**

I now turn to Davidson's request for sanctions.  In his affirmative defenses, Davidson

stated that he notified White by letter on December 12, 2019 under Fed. R. Bankr. P. 9011 that

some or all of White's claims were not supportable by "existing law or even a nonfrivolous

argument."  Davidson also alleged bad faith conduct on the part of White, stating that his

---

[6] Because I have found that White has not met his burden by a preponderance of the evidence as to the elements of § 523(a)(2) and (a)(6), I will not address Davidson's affirmative defense that fraud allegations in § 523(a)(2) are barred by issue preclusion and/or res judicata based on the state court dismissing all counts of that complaint (breach of contract, conversion, and fraud) other than the fraudulent inducement count.  Although, the lack of a final judgment in the state court matter would be a significant impediment to the successful assertion of that defense.

23

purpose was to harass Davidson and cause him to expend costs to defend himself. Davidson

pointed to, among other things, White's standing to assert the claims given that Burch had

terminated the project and released White from his obligations to him. While White reaffirming

his debt to Burch that was subject to a statute of limitations that had passed was problematic,

White asserted other non-frivolous bases for claims to damages. I cannot, therefore, conclude

that this action was frivolous or filed for an improper purpose, despite the extensive and arduous

litigation history. I decline Davidson's request for sanctions from White or his counsel.

## VI.    CONCLUSION

Judgment shall enter in favor of Davidson on each of the two remaining counts, Counts I

and III. I previously granted Davidson's motion for judgment in partial findings on Count II, and

judgment shall enter for him on that count as well. Davidson's request that sanctions be imposed

on White for pursuing these claims is denied.

By the Court,

Dated: September 12, 2022

_____
Christopher J. Panos
United States Bankruptcy Judge